### Pueblo Realty & Trust Co. v. Tate.

*District Court of Pueblo County, March 4, 1901,*

John M. Waldron for plaintiff and J. S. McBeth for defendant.

DIXON, J., delivered the opinion of the court.

On February the first, 1897, certain lots of land situate in the City of Pueblo belonging to The Colorado Coal & Iron Development Company, a corporation, were sold for the delinquent taxes of the year 1895, and certificates of purchase therefor were issued to the defendant in this action. Subsequent to the sale the defendant paid other taxes legally assessed against said property, which payments have been duly noted upon his certificates of purchase. The Pueblo Realty & Trust Company, the plaintiff, as successor to the title, and interest of The Colorado Coal & Iron Development Company, brings this action to quiet title, for the purpose of securing the cancellation of said certificates of purchase, on the ground that said tax sale was illegal and void.

Under the proofs it must be held that the tax sale proceedings were fatally irregular; and as this was practi-

cally conceded at the hearing, it will be unnecessary to discuss the reasons for so holding.

The sole question, then, is how much money should the plaintiff be required to refund to the defendant as a condition precedent to obtaining the relief prayed for?

The plaintiff contends that it should be required to refund only the exact amounts paid out by the defendant on its behalf, together with interest at the rate of eight per cent per annum; on the other hand, the defendant contends that the plaintiff should be placed precisely in the position of a redemptioner, and should be required to pay all the penalties exacted by law for the redemption of property from a legal tax sale.

Section 3864 of 3 Mills Annotated Statutes (Supp.) reads: "On the first day of August the unpaid taxes of the preceding year become delinquent, and shall thereafter draw interest at the rate of fifteen per cent per annum, but the Treasurer shall continue to receive payments of the same with interest until the day of sale for taxes."

Section 3905 in the same volume reads: "Real property sold under the provisions of this act may be redeemed by the owner his agent, assignee or attorney, or by any person having a legal or equitable claim therein, at any time before the expiration of three years from the the date of sale and at any time before the execution of the treasurer's deed to the purchaser, his heirs or assigns by the payment to the county treasurer of the proper county, to be by him held subject to the order of the purchaser, of the amount for which the same was sold, with interest thereon from the date of sale, at the rate of thirty-six per cent per annum for the first six months, thirty per cent per annum for the subsequent six months, and the remaining period the rate of twenty-four per cent per annum, together with the amount of all taxes accruing on such real estate after the first sale paid by the purchaser on his certificate of purchase with in-

terest thereon at the rate of twelve per cent per annum on such taxes so paid subsequent to such sale; but if said subsequent taxes should be paid before the time when unpaid taxes levied for that year should become delinquent, interest shall only be computed from the time of their delinquency."

Suppose that A and B are two delinquent tax payers. A's property is advertised and sold, and by inadvertence B's property is omitted from the sale. Both are guilty of the same neglect of duty, namely, the failure to pay their taxes promptly. The sale turns out to be irregular and void. Can it be contended with any show of reason that A should incur the enormous penalties prescribed in section 3905, while B can escape by the payment of the interest prescribed in section 3864? I think not. The translation of the property owner from the position of a delinquent tax payer to the position of a redemptioner, with its onerous burdens, cannot be effected by the passage of a few minutes of time, or by proceedings which are, in law, a nullity. It cannot be thought that the Legislature ever contemplated that so great a result should be accomplished without a corresponding cause; and that cause can be only a legal sale under the provisions of the act.

The only penalty which the law imposes upon the delinquent tax payer is the payment of interest at the rate of fifteen per cent per annum, and no other penalty can in law be demanded until his property be legally sold. The penalties prescribed by section 3905 are not penalties for failure to pay taxes, nor penalties for suffering the property to be offered at tax sales; but they constitute the price which the law exacts from the delinquent tax payer for the privilege of redeeming his property from a legal sale, which if not redeemed from would result in an unassailable legal title in the tax purchaser.

So the statute, in express terms, provides that it shall

apply to real property sold under the provisions of the statute. Hence, if in conducting the sale, there should be any substantial violation of the provisions of the act, the property is not sold under its provisions, and the statute cannot apply. It seems to me, therefore, entirely too clear for argument that before a purchaser at a tax sale can exact the penalties prescribed in section 3905, he is bound to show that he purchased at a sale made in substantial compliance with the provisions of the act, and therefore regular and legal.

But it is contended by the defendant that although section 3905 does not apply in law, yet when the delinquent tax payer comes into a court of equity seeking equity, it is the duty of the court to compel him to do equity, and it should by analogy apply this statute in determining what is equity for him to do. It is argued that since the taxes were legally due and delinquent, the county treasurer had the right to make a sale, and the plaintiff should not be permitted to complain because an irregularity crept into the proceeding which put him in no worse condition than he might and should have been placed in, if the law had been complied with.

I cannot assent to this reasoning. The legal obligation of the delinquent tax payer to the county is the amount of his taxes, with interest at fifteen per cent from the date of delinquency. Whatever is exacted beyond this amount is a penalty, and such penalties can be created only by statute. Every citizen, therefore, from whom such exactions are sought, has the right, under his constitutional guaranties, to demand the production of the statute creating such penalties, and the proof that he is amenable to that statute. Equity never concerns itself with penalties except to grant relief against them. It never creates them; it has no power to create them. I concede the full force of the maxim: "He who seeks equity must do equity." It is the only hope of the purchaser at

an illegal tax sale. But the maxim announces a defensive, not an agressive principle. It does strip the plaintiff to fatten the defendant; but always aims to restore to the defendant that which is his own, and no more. All that equity ever requires of a suitor is "to do equity;" and to do equity does not mean to suffer punishment.

Moreover, it must be considered that there can be discovered no reason, either in law or in equity, why the purchaser at an illegal tax sale should be rewarded at the expense of the property owner, since he is charged with notice of the illegal character of the sale. In the case of Morris et al. v. St. Louis N. Bk., 17 Colo. 237, the Supreme Court says: "The purchaser as a matter of fact knows of the sale at the outset—knows that he is taking steps to acquire a title which may invalidate the title of the original owner. As he does not undertake to buy from the owner, he is bound as a matter of law to take notice, at his peril, whether the official agents of the government have or have not authority to sell."

The contention, then, of the defendant, stated in all its nakedness, is this: when a citizen whose property has been struck off at an illegal tax sale seeks relief in a court of equity, that court must say to him: "True, the sale was illegal and void; the purchaser took nothing thereby; his certificate is a nullity, and his deed, if he obtains one, will be void. He can never disturb you in your possession without being guilty of trespass, and if he brings an action to dispossess you he will be defeated. But these tax sale proceedings of record constitute an adverse claim, which will in all probability prevent you from disposing of your property. You seek to have it quieted in this court by obtaining the cancellation of the certificates. You are undoubtedly entitled to the relief; but as a condition precedent, this court will require you not only to discharge your legal and just obligation to the public, but in addition thereto, it will require you to pay a heavy fine,

which it will beneficently bestow upon the purchaser as a reward for his attending and bidding at a tax sale which he knew to be illegal."

If there are any principles of equity which will sustain this contention, I frankly confess that I do not know what they are. The only case, to which I have been referred, which attempts, by any process of reasoning, to defend such a position is the case of Rice v. Jerome, 97 Fed. Rep. 719. In the opinion it is said: "The fact is recognized that the titles acquired at tax sales are frequently—we might say generally—invalid for some irregularity in the sale. This is so well known that there would be few bidders for lands sold at tax sales if the purchasers had to rely solely on maintaining the validity of the sale and lost their investment when that proved invalid. Such a rule would encourage delinquency, and discourage the sale of delinquent lands, and practically deprive the state of her taxes on lands whose owners chose not to pay them. It is therefore the policy of the state to encourage the purchase of delinquent lands at tax sales by giving the purchaser who pays the taxes of the delinquent owners a lien upon the land for the taxes paid, with liberal interest and penalties whether the sale be valid or invalid."

With due deference to the learned court, I question the wisdom of a policy which is based upon the presumption of a general and continued failure to execute the laws, which places a premium upon negligence and incompetency in public officials, and which disarranges all our ideas of the symmetry of law by visiting the same consequences upon legal and illegal acts.

But be that as it may, I am thoroughly persuaded that such can be declared to be the policy of the state only by the law making branch of the government through an express statute, and that no court can promulgate it as a rule of equity without doing violence to its fundament-

al principles.

On the other hand, I cannot agree with the conten-tion of counsel for the plaintiff. At the date of the tax sale, the taxes of the plaintiff's grantor were due and delinquent, and were then drawing interest at the rate of fifteen per cent per annum. The plaintiff should not be permitted to come into court, allege absolute nullity of the tax sale proceedings, and yet claim by virtue of those proceedings the rate of interest upon the debt should be reduced from fifteen to eight per cent. Equity never permits a party guilty of laches or neglect of duty to better his position or make a profit out of his laches or neglect; and the same principle should be applied to the delinquent taxes subsequently paid by the defendant, which were undoubtedly paid as a consequence of the tax sale proceeding.

In my judgment the true principle to be applied to this case is the general principle of equity that whenever property is sold for the satisfaction of a lien debt, and the sale is declared to be illegal and void, the purchaser at such sale should be subrogated to the rights of the lien holder. In this case, then, we should assume that no tax sale had ever been held, and that no subsequent taxes had ever been paid by the defendant. What then would be the state of the plaintiff's account with the county treasurer? It would be indebted for the taxes for 1895, with interest thereon from the day of the delinquency to the present time at fifteen per cent per annum; it would be indebted for the taxes for the subsequent years paid by the defendant, with interest thereon at fifteen per cent per annum from the day of the delinquency to the present time; and these sums, without any costs, charges or penalties, constitute what the plaintiff in good conscience ought to pay as a condition precedent to the relief prayed for in this action.

This position I think is sustained by the overwhelm-

ing weight of authority, and I may add that it is sustained by the·only case, with the exception of the Colorado cases, cited by the federal court in Rice v. Jerome, *supra*, namely, the case of Coats v. Hill, 41 Ark. 149. The excerpt reproduced in Rice v. Jerome reads: "By our laws, taxes are *glebae ascripti*,—serfs of the soil,—a charge which follows the land, in whosoever hands it may go. And if the tax sale may be invalid to divest the title of the former owner, by reason of irregularities and failure of the officers properly to discharge their duties, yet the purchaser is subrogated to the lien of the ·state." It is true that the federal court adds that there is a long line of Arkansas cases holding that the purchaser at an illegal sale is entitled to all the penalties that may be exacted by the purchaser at a legal sale. I have not had access to to the cases, but if this statement be correct, it only shows that a wrong application has been made of a correct principle. The rule laid down in Coats v. Hill is undoubtedly the proper one, and in applying that rule it is self-evident that the lien of the state extends only to the amount of taxes due, with statutory interest.

In Morris et al. v. St. Louis N. Bk., *supra*, it seems to be very evident from the discussion on page 237 that the supreme court, as then constituted, considered that the purchaser at a tax sale took his chances of profit, contingent upon the validity of the sale. And it is there said: "By the liberal provisions of our revenue act, however, he (the purchaser) takes little or no risk, since the purchase money must, in almost·every instance, be returned to him with interest; if the sale proves to be invalid." Not one of the Colorado cases decided by either of the appellate courts prior to the decision of Charlton v. Kelley, 24 Colo. 273, drops any intimation in conflict with the views here expressed. On the contrary, I think that they all, as far as they go, sustain them.

In Charlton v. Kelley the action was to remove a

cloud upon the title, the cloud consisting of a tax deed under which the defendant claimed. It was held that the tax deed being void, as a condition precedent to the cancellation, the plaintiff should be decreed to pay into court for the use of the defendant an amount sufficient to reimburse him for the amount for which the land was sold at the tax sale, with interest thereon and penalties prescribed by section 3905, above set forth, together with the amount of subsequent taxes paid by him, witn interest thereon at the rate designated in section 3905, Mills Annotated Statutes.

Counsel for plaintiff contends that while this case is binding authority upon this court under the same state of facts, yet, if the court is of the opinion that the decision is wrong in principal, it should not apply to a state of facts not precisely the same; and since that was an action to cancel a tax deed, and this an action to cancel a tax certificate, the case should not govern.

This is treading upon dangerous ground. I think that it is the privilege,—nay, even the duty,—of the trial judge to express his reasons for not being able to agree with the conclusion of the Supreme Court in any case which he is called upon to apply, for the purpose of contributing what he may towards securing a reconsideration of the questions involved. But when he *acts* judicially the case is far different. To him then the supreme court is infallible. Its decisions must always be taken as correct, and he is bound to apply them, not only to cases involving the same precise facts, but to every case where the facts are so analagous as to require in reason the application of the same principle.

I do not understand that in Charlton v. Kelley the supreme court holds that section 3905 is in law applicable to invalid sales. That was a proceeding in equity, and the only reason assigned by the court for its conclusion on this point was in four words—"It is only fair,"

This is not the statement of a legal conclusion, but of an equitable principle; and the principle applied, fully stated, is that in this jurisdiction a court of equity must exact from the citizen, as the price of relief from an illegal tax sale, the same penalties which the law exacts as the price of relief from a legal sale.

I can discover no reason which should distinguish the case at bar from the case of Charlton v. Kelly. If it is equitable that the penalties prescribed by section 3905 should be exacted in one case, they should be exacted in the other.

Therefore, constrained by the authority of the Supreme Court in the decision referred to, I am compelled to hold that as a condition precedent to the relief prayed for, the plaintiff must pay into court for the use of the defendant the sums of money, interest and penalties provided for by section 3905, and a decree will be entered accordingly.